UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FLYING FISH BIKES, INC.,

    Plaintiff,

v.                                                          CASE NO. 8:13-cv-2890-T-23AEP

GIANT BICYCLE, INC.,

    Defendant.

_____/

**ORDER**

Flying Fish Bikes, a retail distributor of bicycles and bicycle accessories, sues Giant Bicycle, a wholesale distributor. The complaint alleges that Giant defrauded Flying Fish into believing both that Giant would continue supplying Flying Fish and that Giant would not supply any nearby competitor. Allegedly relying on Giant's representations, Flying Fish "order[ed] over $120,000.00 worth of Giant inventory." (Doc. 64 ¶ 19) However, contrary to Giant's alleged representations, Giant "was making plans, designing and assisting in the purchase of a store front to be owned by [Giant's] affiliate or close ally which would serve as a major dealer of [Giant's] products less than two miles from [Flying Fish's] store." (Doc. 64 ¶ 17) Eventually Giant executed the "plans." Flying Fish sues (Doc. 64) "for damages based upon fraud" (Count I) and "for punitive damages" (Count II). Discovery is complete, and Giant moves (Doc. 110) for summary judgment on both counts.

**1. Fraud**

"An aggrieved party proves common law fraud by establishing that: (1) the opposing party made a misrepresentation of a material fact, (2) the opposing party knew or should have known the falsity of the statement, (3) the opposing party intended to induce the aggrieved party to rely on the false statement and act on it, and (4) the aggrieved party relied on that statement to his or her detriment." *Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 595 n.2 (Fla. 2013).

*A. Misrepresentation of a Material Fact*

The complaint alleges that a Giant representative told Flying Fish that "Giant was fully committed to partnering with [Flying Fish] . . . and that [Giant] would continue to support and service the account and [Flying Fish's] position as a dominant dealer just as [Giant] had in years past." (Doc. 64 ¶14)  Giant argues that "Flying Fish has utterly failed to identify any particular instance in which . . . [a] GIANT representative[] made a specific promise or assurance that GIANT would not terminate its business relationship with Flying Fish or support an existing distributor . . . in order to induce Flying Fish to order product in September 2012." (Doc. 110 at 12)

Purporting to disprove Giant, Flying Fish identifies a conversation between Taylor Norton (a purchaser for Flying Fish) and Geoffrey Godsey.  In his deposition, Norton describes the conversation:

> Q. Tell me about what you and Mr. Godsey discussed . . . .
>
> A. . . . [W]e spoke specifically about continuing business with Flying Fish Bicycles.
>
> Q. What was your understanding of continuing business with GIANT?
>
> A. That he very much wanted to start over on a new leaf, that things hadn't been great in previous months. He very much wanted to get off and start again and ensure a pleasant business relationship between the two companies.

(Doc. 79 at 32:11–24) Giant responds, "At most, Godsey merely expressed his opinion that he wanted to 'reset' the already strained business relationship between GIANT as a distributor and its now former, independent retailer — Flying Fish. Such an innocuous statement does not give rise to a fraud claim which is an intentional tort." (Doc. 110 at 12 (citation omitted))

The second representation that Flying Fish cites is a verbal response to a September 17, 2012 email from Fran Kane (the owner of Flying Fish) to Godsey. The email from Kane states, "On another note we have been told in the last few years at your corporate gatherings that Giant was consolidating dealers. In that time Giant has done just the opposite and added dealers locally. We would like to have a clarification on what your plans may actually be." (Doc. 112-1 at 1) Flying Fish cites Kane's deposition in which Kane describes Godsey's (verbal) response to the email inquiry:

> Q. What did [Godsey] tell you about the future relationship?
>
> A. That [Giant] value[s] our business. He apologized and let's reset. You know, I'll take care of the account, I'll work with you directly, and

- 3 -

we'll get through this, and that — you know, I don't know how many times the word "reset" was used.

Q. Right. From the time you first had that conversation with him all during the purchasing season . . . , did that message ever change from Mr. Godsey?

A. No. It just got stronger as far as, you know, how important we were, and, you know, strategic in the market, and the long-term relationship. You know, everything to make you believe that . . . he was earnest in what he was saying.

. . . .

Q. Did you at some point ask or seek clarification on GIANT's position on opening up competing GIANT stores in your area? Did you —

A. Actually multiple times with [Godsey] because GIANT had a history . . . of saying, well, we're going to have less vendors and we're not going to open up any new stores, we're going to have less stores. And then you'd find out about . . . a new store being opened at an area that nobody was aware of. There was one like that down in St. Pete . . . .

Q. And what did Mr. Godsey tell you when you inquired about that?

A. "Just the vendors we're using right to now." I mean, just, you know, in this market, the dealers we're using in this market.

Q. So clarify that for me. Did Mr. Godsey ever indicate to you that they were thinking of . . . [b]ringing in a competing GIANT store, either a GIANT store or a store handling GIANT product . . . into your area?

A. No, it was just the opposite. It was, you know, we want to build — you know, your presence in the market; hence, all the incentives; hence, the reset; hence, he'll work with us directly, you know.

Q. So Mr. Godsey didn't just remain silent when you asked him about those things; he actually responded to you?

A. Yes, and he just gave me — the same set of lies just continued.

- 4 -

(Doc. 35 at 274:8–276:12)  Flying Fish also cites Godsey, who states that he told Fran that Giant had a plan "to grow [Giant] within existing retailers," to "get more display space within retailers and be able to do more business with less retailers," and to "display [more] within the retailers [Giant] currently work[ed] with." (Doc. 81 at 87:16–19, 88:5–6)  This genuine issue of material fact is properly resolved at trial, not by summary judgment.

*B. Reliance*

The complaint states, "In reliance on the answers received from the Giant representative, and without knowledge of the ongoing efforts to create a competing store in close proximity, or of Giant's intention to terminate the business relationship, [Flying Fish] order[ed] over $120,000.00 worth of Giant inventory." (Doc. 64 ¶ 19)

Giant argues that Flying Fish never relied on Giant's representations.  Giant cites a December 21, 2012 email to Godsey in which Kane states that Flying Fish "w[as] not surprised" by Giant's termination of business dealings with Flying Fish and that Flying Fish "knew about [Giant's] plans months" in advance. (Doc. 110-6 at 1)  Giant argues that Flying Fish cannot characterize Kane's "admission" as a "reactionary rant" because "six . . . months later (i.e., on June 4, 2013), Kane confirmed his prior knowledge in a second email." (Doc. 110 at 14)  In the email, Kane states that Flying Fish "realize[d Giant's] conflicting relationship with [the new competitor that sells Giant bikes] over the years." (Doc. 110-8 at 1)

Flying Fish responds that, even if Kane's statements are not merely "angry, emotional email[s]," the statements show only that Kane knew of Giant's "intentions" before Giant formally announced the "intentions" to Flying Fish, not that Kane knew of Giant's "intentions" when Flying Fish purchased from Giant. (Doc. 112 at 13) Further, Flying Fish cites Kane's deposition in which Kane states (1) that Giant's "commitment to continue the relationship" convinced Flying Fish to purchase from Giant, (2) that Flying Fish "would never, ever have entered into [the purchased from Giant] had [Flying Fish] known what [Giant's] plans were," and (3) that Flying Fish "would not have made an increased commitment without all those assurances." (Doc. 35 at 242:14–20, 248:6–7, 276:15–16) This genuine issue of material fact is properly resolved at trial, not by summary judgment.

**2. Fraudulent Concealment**

Giant argues for summary judgment "to the extent that Flying Fish" sues for fraudulent concealment. The complaint alleges "fraud" (not "fraudulent concealment" or "fraudulent omission"), and the complaint alleges fraudulent statements (not omissions or concealments). Fraud and fraudulent concealment (or fraudulent omission) are distinct. *Compare R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1068 (Fla. 1st DCA 2010) (listing the six elements of "fraud by concealment"), *with Jackson v. Shakespeare Found., Inc.*, 108 So. 3d 587, 595 n.2 (Fla. 2013) (listing the four elements of "common law fraud"). Accordingly, Giant's motion for summary judgment on fraudulent concealment is moot.

### 3. Punitive Damages

Count II alleges an "action for punitive damages." (Doc. 64 at 5) However, "punitive damages are not an independent cause of action. Rather, punitive damages are merely a remedy that must be asserted in conjunction with a substantive claim." *Philip Morris USA, Inc. v. Hallgren*, 124 So. 3d 350, 355 (Fla. 2d DCA 2013) (Sleet, J.); *accord Tarasewicz v. Royal Caribbean Cruises Ltd.*, 2015 WL 1566398, at *2 (S.D. Fla. Apr. 8, 2015) (Bloom, J.) ("[P]unitive damages are not a separate cause of action but part of a plaintiff's prayer for relief."); *Foley v. Orange Cnty., Fla.*, 2012 WL 6021459, at *7 (M.D. Fla. Dec. 4, 2012) (Dalton, J.) ("[T]here is no need to set out a separate count for punitive damages. Punitive damages are a form of relief, not a freestanding cause of action. Such a claim for damages must be linked to a substantive claim for relief."); *Soffer v. R.J. Reynolds Tobacco Co.*, 106 So. 3d 456, 464 (Fla. 1st DCA 2012) (Lewis, J., concurring in part and dissenting in part) ("[P]unitive damages are merely a remedy and can only be recovered pursuant to a substantive claim."). Accordingly, Count II is construed as a request for a remedy for the fraud claim in Count I.

Under Section 768.72(2), Florida Statutes:

> A defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence. As used in this section, the term:
>
> (a) "Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would

> result and, despite that knowledge, intentionally pursued that
> course of conduct, resulting in injury or damage.
>
> (b) "Gross negligence" means that the defendant's conduct was
> so reckless or wanting in care that it constituted a conscious
> disregard or indifference to the life, safety, or rights of persons
> exposed to such conduct.

Further, under Section 768.72(3):

> In the case of a[] . . . corporation . . . , punitive damages may be
> imposed for the conduct of an employee or agent only if the conduct of
> the employee or agent meets the criteria specified in subsection (2) and:
>
> (a) The . . . corporation . . . actively and knowingly participated
> in such conduct;
>
> (b) The officers, directors, or managers of the . . . corporation . . .
> knowingly condoned, ratified, or consented to such conduct; or
>
> (c) The . . . corporation . . . engaged in conduct that constituted
> gross negligence and that contributed to the loss, damages, or
> injury suffered by the claimant.

Giant argues that "there is simply nothing in this record that indicates that there are disputed facts with respect to Flying Fish's claim for punitive damages in this case." (Doc. 110 at 20)

*First Interstate Development Corp. v. Ablanedo*, 511 So. 2d 536, 539 (Fla. 1987), explains that, in an action such as this, the jury must determine whether the plaintiff shows intentional misconduct or gross negligence:

> [P]roof of fraud sufficient to support compensatory damages necessarily
> is sufficient to create a jury question regarding punitive damages. This is
> so because intentional misconduct is a necessary element of fraud.
> Indeed, to prove fraud, a plaintiff must establish that the defendant
> made a deliberate and knowing misrepresentation designed to cause,
> and actually causing detrimental reliance by the plaintiff.

- 8 -

Accordingly, because this order denies Giant's motion for summary judgment on the fraud claim, the jury must determine whether Godsey or another Giant "employee or agent" defrauded Flying Fish intentionally or with gross negligence. Further, although *First Interstate* appears compatible with denying punitive damages under Section 768.72(3), Flying Fish argues that Godsey is a Giant manager, and Giant appears to concede that fact by labeling Godsey as a "Regional Sales Manager for GIANT." (Doc. 110 at 2)

## CONCLUSION

Giant's motion (Doc. 110) for summary judgment is **GRANTED** on Count II. Count II is construed not as an independent claim but as a request for relief under Count I. Giant's motion (Doc. 110) for summary judgment is otherwise **DENIED**.

ORDERED in Tampa, Florida, on May 29, 2015.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE