UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FLYING FISH BIKES, INC.,

      Plaintiff,

v.                                    CASE NO. 8:13-cv-2890-T-23AEP

GIANT BICYCLE, INC.,

      Defendant.

_____/

## **ORDER**

Flying Fish Bikes, a retail distributor of bicycles, sued (Doc. 64) Giant Bicycle, a wholesale distributor of bicycles and Flying Fish's former supplier. Flying Fish alleged that — by falsely promising that Giant would not supply any nearby competitor and by falsely promising that Giant would continue to supply Flying Fish — Giant fraudulently induced Flying Fish to purchase Giant bicycles. (Doc. 64 at 5) More specifically, Flying Fish alleged that while pledging continued loyalty to Flying Fish and while negotiating a historically large purchase of bicycles by Flying Fish, Giant was simultaneously scheming with Outspokin, another bicycle retailer, to open a new store and to sell Giant bicycles in competition with Flying Fish — less than a mile-and-a-half from Flying Fish. Soon after Flying Fish's purchase of Giant bicycles, the new Giant–Outspokin store opened and began selling Giant bicycles. Giant abruptly terminated Flying Fish.

After a seven-day trial (Docs. 172, 174–179), a jury awarded (Doc. 182) Flying

Fish $250,000 in compensatory damages and $3 million in punitive damages.  Giant

timely moves (Doc. 202) for judgment as a matter of law and timely moves

(Doc. 201) for a new trial or for a remittitur.

## BACKGROUND

Flying Fish sold Giant bicycles for six years.  Of the seven brands of bicycles

that Flying Fish sold, Giant accounted for the highest sales and the highest profit

margin.  At any given time, a quarter of Flying Fish's inventory was Giant bicycles.

(Doc. 215 at 127)

Before the beginning of each calendar year, the parties negotiated the type,

quantity, and price of the bicycles that Flying Fish would purchase that year.

However, by September 2012, when negotiations for 2013 began, the parties'

relations had soured, principally for three reasons.  First, Giant hired two

executives — John Thompson as the executive sales director and Geoff Godsey as a

regional sales manager — from Specialized, another bicycle manufacturer, which

recently had stopped supplying Flying Fish.  (Pl.'s Ex. 83 at 3; Pl.'s Ex. 130 at 2, 3, 5;

Pl.'s Ex. 162 at 1)  Francis Kane, the owner of Flying Fish, disapproved Specialized's

strategy of operating manufacturer-owned stores ("concept stores") to the detriment

of existing retailers, such as Flying Fish.  Kane worried that the new executives

would employ the "concept store" strategy at Giant.  (Pl.'s Ex. 130 at 2)  Second,

Giant began to focus on selling premium bicycles ("$2,000 and above"), which Flying Fish refused to sell.  (Pl.'s Ex. 46 at 1, 2; Pl.'s Ex. 83 at 2; Pl.'s Ex. 127 at 3) Third, Kane disliked Giant's new sales representative, Mickey Singer, whom Kane accused of maintaining close relations with Outspokin, a Flying Fish competitor.[1] (Pl.'s Ex. 53 at 1; Pl.'s Ex. 130 at 1)  Tension peaked on July 31, 2012, when Singer, e-mailing Godsey but inadvertently copying Kane, stated, "[Kane] is a baby and I guess we need to treat him as such. . . .  I guess he's a dick too."  (Pl.'s Ex. 40 at 2) In response to Singer's e-mail, Kane demanded that Godsey assign a different sales representative to the Flying Fish account.  (Pl.'s Ex. 50 at 1; Pl.'s Ex. 53 at 1; Pl.'s Ex. 130 at 1)

Although apologizing for Singer's insulting behavior, Godsey refused to replace Singer as Giant's sales representative to Flying Fish.  Instead, Godsey himself conducted the 2013 negotiation with Flying Fish.  (Pl.'s Ex. 54 at 1, 2; Pl.'s Ex. 62 at 5, 6)  In a September 11, 2012 e-mail to Kane, Godsey emphasized Giant's commitment to renewed and lasting relations between Giant and Flying Fish:

> As I outlined on the phone . . . the intent of mine and [Thompson]'s approach to moving forward this year is to hit the "reset" button. We would like to see relationship w/ GIANT back on the right foot. I feel like there are a number of things that have transpired over the last several months straining the relationship and my hope is this allows everyone to take a step back, removes any pressure [Kane] may consider unrealistic expectations and allows all parties to take a deep breath and re-evaluate so we can move forward.

---

[1] At the time, Outspokin had a store only in Clearwater, Florida.

> While I am new to GIANT . . . I was brought here for a specific purpose. I am confident I can speak on the behalf of our entire management team in saying we really are sincere in our appreciation of the effort GIANT retailers put into making our products a key part of their business. We know retailers have a choice and I hope you are as excited about the opportunities for 2013.

(Pl.'s Ex. 46 at 2)

However, as early as July 17, 2012, Giant was discussing the prospect of Giant's combining with Outspokin to open a concept store in the heart of Flying Fish's principal market — "the Howard Ave. area of Tampa."  (Pl.'s Ex. 33 at 1; Pl.'s Ex. 38 at 1)  Godsey expected the Giant–Outspokin store to dedicate "a minimum of eighty percent (80%) of [the] floor space" to Giant bicycles, to feature Giant's logo on the store's exterior sign, and to benefit from Giant's contribution to the "general store design."  (Pl.'s Ex. 67 at 2; Pl.'s Ex. 78 at 1, 2; Pl.'s Ex. 85 at 1)  Although Stan Tavanese, the owner of Outspokin, suggested opening the store in St. Petersburg, Florida, Thompson persuaded Tavanese to open the store in "the Howard Ave. area" and stated, "I believe the cycling retail space is ripe there (Specialized store is in a funky location, Flying Fish is tired, and the Trek Store is doing $1.5M)."  (Pl.'s Ex. 33 at 1)  On September 14, 2012, Outspokin acquired a prime retail property in "the Howard Ave. area."  (Pl.'s Ex. 49 at 1; Pl.'s Ex. 58 at 1)

Aware that Kane would oppose the Giant–Outspokin store, on September 17, 2012, Godsey confided in other Giant executives, including Elysa Walk, the general manager, about his concerns — "[T]his location is 1.5 miles or less from one of the Flying Fish locations.  Have spoken to [Thompson] regarding HOW we are going to

handle assuming the timeline above. . . .  [T]he reality is [Kane] will know about the

new location sooner than later." (Pl.'s Ex. 52 at 1)  On September 18, 2012, Godsey

advised Gregg Frederick, the director of retail services for Giant, to keep the

Giant–Outspokin store confidential:

> [Tavanese] has assured me he and his staff are going to remain as
> discrete as possible . . . but most likely this is going to blow-up sooner
> than later and I will have to make a trip to Tampa to deal w/ [Kane].
> Would ask that you do what you can to both keep this as under the
> radar as possible . . . reminding [Outspokin] that the quieter we can keep
> this . . . better it is for everyone.

(Pl.'s Ex. 58 at 1)

In addition to keeping the Giant–Outspokin store secret from Flying Fish and

Kane, Godsey offered Flying Fish the extraordinary incentive of Giant's "NOT

forc[ing] or pursu[ing] an[] . . . Enrollment," (Pl.'s Ex. 52 at 1), which is "a large

order that sets [a retail distributor's] pricing structure for the year." (Doc. 212 at 157)

In other words, Giant offered to sell bicycles at a volume discount without requiring

Flying Fish to place a large up-front order for 2013.  Flying Fish could order, and

Giant would supply, the bicycles on an as-needed basis but at a volume-discounted

price.  However, Giant's strategy was designed to acquire Flying Fish's trust and to

induce Flying Fish to commit to Giant as the primary product line but to permit

Giant, having secured Flying Fish's commitment to Giant's product, to abruptly

terminate Flying Fish as a retail distributor.

The Dealer Agreement, which the parties signed in 2006[2] and which automatically renewed at the beginning of each year, allowed "either party [to] terminate this Agreement, without cause, upon 90 days written notice to the other party."[3]  (Def.'s Ex. 4 at 4)  Since 2006, Giant had not suggested exercising this right to terminate.  Rather, during the negotiations, Giant re-emphasized renewed and lasting relations with Flying Fish.  (Pl.'s Ex. 54 at 2; Pl.'s Ex. 62 at 1)  Although Frederick "advised both [Singer] and [Godsey] that [he] didn't feel it was the right thing to do, to sell [Kane] bicycles at this time knowing that we're going to open" the Giant–Outspokin store, Singer responded, "I have three kids to feed[;] I need the order," and Godsey responded, "I'm here to sell bikes and we need to hit numbers in [the fourth quarter], so we need to do what we can to sell bikes."  (Doc. 213 at 153–54)

Unaware of Giant's intention to terminate the Dealer Agreement, Flying Fish thanked Giant for "not being shoehorned into an enrollment commitment" and gladly accepted Giant's offer of reduced prices.  Flying Fish's September 28, 2012 order for bicycles totaled $120,000, Flying Fish's largest-ever order from Giant.  (Pl.'s Ex. 62 at 2, 6; Pl.'s Ex. 70 at 1)  Soon after Flying Fish placed the order, Godsey e-mailed Thompson, "Just copied you on message I received from Flying

---

[2] The parties renewed the Dealer Agreement in 2007, when Kane changed the retailer's name from Dud Thames Bike to Flying Fish Bikes. (Def.'s Ex. 4 at 1)

[3] The Dealer Agreement designates Flying Fish as a "dealer" of Giant bicycles and lists "terms and conditions" that would apply to any order by Flying Fish. (Pl.'s Ex. 2 at 2) The Dealer Agreement contains no minimum number of bicycles that the dealer must purchase each year.

Fish . . . surprise, surprise . . . he accepted our terms :-) . . . This should keep us in

position w/ product in the market until the distribution change associated w/

Outspokin materializes." (Pl.'s Ex. 70 at 1) Godsey's plan had succeeded.

After Flying Fish's purchase and in an e-mail to Allen Needle, the sales

operations manager for Giant, Godsey recapitulated Giant's strategy:

> [T]his decision . . . was something [Johnson] and I discussed when we
> put our strategy together for managing Flying Fish thru enrollment
> without enrolling them while we were waiting for Outspokin's second
> location to get open. We did not want to lose momentum in Tampa
> during [the fourth quarter] so we provided [Kane] incentive to keep
> doing business with us . . . in fact . . . got him to grow business with us.

(Pl.'s Ex. 132 at 2; *see* Pl.'s Ex. 138 at 1 ("[We] discussed and this was very strategic.

By NOT requiring [Kane] to enroll . . . and allowing him to order whatever he

wanted . . . he cannot say we forced any bikes on him."); Pl.'s Ex. 62 at 1

("[U]nderstand this is completely outside how we are doing business in every other

market in the US."); Pl.'s Ex. 138 at 1 ("[W]e did NOT require him to enroll . . . like

we did every other dealer in the US."))

Even after Flying Fish's purchase, Giant prevented Flying Fish's preparing for

Giant's planned termination of Flying Fish. On October 10, 2012, when Tavanese

informed Godsey about his plan to "announce to [Outspokin's] associates . . . about

our expansion plans," Godsey instructed Tavanese to "keep GIANT out of the

conversation . . . meaning . . . there is no need to discuss what brands you will be

taking to that location." (Pl.'s Ex. 73 at 1) Accordingly, Tavanese deferred telling

his staff about the "brands that [the Tampa] store will carry." (Pl.'s Ex. 74 at 1)

Reminding Tavanese "[d]on't let this get out :-)," Godsey stated on October 24, 2012:

> Please understand . . . not trying to hold you back. . . . I am just requesting (on behalf of GIANT) that we not create in unnecessary headaches for either of us. There are going to be competitors of both of ours that are going to w[ant] to see us unsuccessful in this partnership together. With that in mind . . . want to give them as little opportunity to prepare for the bomb you [are] about to drop as possible :-)

(Pl.'s Ex. 82 at 1)

On November 11, 2012, Godsey e-mailed Thompson, "As for Flying Fish[, I] began laying ground work to make transition out of that relationship.  At this point [Kane] has ZERO idea about what is about to take place.  I played things very cool, remained calm and [Kane] is all BARK and no BITE as I suspected." (Pl.'s Ex. 93 at 1)  On November 27, 2012, after Giant and Outspokin began work on the interior of the new store, a suspicious Joel Gorman, the operations manager for Flying Fish, e-mailed Singer to ask about a rumor that Giant was "opening up [a store] in South Tampa," which includes "the Howard Ave. area." (Pl.'s Ex. 106 at 1)  Soon after, Singer responded to Gorman, "I'm not aware of any distribution changes taking place in S[outh] Tampa." (Pl.'s Ex. 107 at 1–4)  On approximately December 14, 2012, Outspokin's sign with Giant's logo appeared on the new store.  (Pl.'s Ex. 110 at 1; Pl.'s Ex. 119 at 1)

On approximately December 20, 2012, Godsey met Kane to announce Giant's termination of the Dealer Agreement.  (Pl.'s Ex. 109 at 1; Pl.'s Ex. 127 at 3)  At the time, Flying Fish had sold only 17% of the Giant bicycles that Flying Fish had

bought for 2013.  (Doc. 215 at 127; Doc. 216 at 72; Doc. 222 at 11 n.4)  And on

January 8, 2013, Giant sent Kane, in accord with the Dealer Agreement, a written

notice of "[Giant's] intent to end business relations with [Flying Fish] as an

authorized Giant dealer."  (Pl.'s Ex. 129 at 2)  The notice stated that Giant "will

continue to process [Flying Fish's] request for Giant products . . . on a prepaid basis

until June 30, 2013.  We will also honor all warranty for this same period."  (Pl.'s Ex.

129 at 2)  Accordingly, Flying Fish continued ordering Giant bicycles in 2013.

(Def.'s Exs. 26.3, 26.5, 26.6, 26.7)  On November 14, 2013, after Giant completed

processing Flying Fish's last request for Giant's products, Flying Fish sued (Doc. 1)

Giant for fraudulent misrepresentation.  After a seven-day trial (Docs. 172, 174–179),

a jury found (Doc. 182) for Flying Fish and against Giant.

## DISCUSSION

At the close of Flying Fish's case-in-chief, Giant moved (Doc. 215 at 102) for

judgment as a matter of law, but the motion was deferred.  At the close of Giant's

case-in-chief, Giant again moved (Doc. 215 at 228) for judgment as a matter of law,

which motion was denied.  After the verdict for Flying Fish, Giant renewed

(Doc. 202) the motion for judgment as a matter of law and moved (Doc. 201) for a

new trial or for a remittitur.  Under Rule 50, Federal Rules of Civil Procedure, a

party "may file a renewed motion for judgment as a matter of law and may include

an alternative or joint request for a new trial under Rule 59."  The resolution of a

Rule 50 motion precludes the resolution of a Rule 59 motion.  *See Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 253 (1940); *accord Johnson v. Clark*, 484 F. Supp. 2d 1242, 1246 (M.D. Fla. 2007) (Wiseman, J.), *aff'd*, 294 Fed. Appx. 502 (11th Cir. 2008) (per curiam).

## I. Giant's Motion for Judgment as a Matter of Law

The motion for judgment as a matter of law denies that Flying Fish provided (1) that Giant committed fraudulent misrepresentation, (2) that flying Fish suffered lost profits as a result of Giant's fraudulent misrepresentation, and (3) that Giant's fraudulent misrepresentation entitles Flying Fish to punitive damages.  "A district court should grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action."  *Collins v. Marriott Int'l, Inc.*, 749 F.3d 951, 957 (11th Cir. 2014).  The resolution of a motion for judgment as a matter of law requires "review[ing] all of the evidence in the record and . . . draw[ing] all reasonable inferences in favor of the nonmoving party.  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004) (citations and quotation marks omitted).

### A.   Flying Fish proved Giant's fraudulent misrepresentation.

The renewed motion for judgment as a matter of law argues that Flying Fish "present[ed] no legally sufficient evidentiary basis for a reasonable jury to find for

[Flying Fish] on a material element of" fraudulent misrepresentation.  (Doc. 202 at 4)

*Jackson v. Shakespeare Foundation, Inc.*, 108 So. 3d 587, 595 n.2 (Fla. 2013), lists the

"material elements" of fraudulent misrepresentation:

> (1) the opposing party made a misrepresentation of a material fact,
> (2) the opposing party knew or should have known the falsity of the
> statement, (3) the opposing party intended to induce the aggrieved party
> to rely on the false statement and act on it, and (4) the aggrieved party
> relied on that statement to his or her detriment.

(citing *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010)).  By concluding that Flying

Fish has "proven its claim against Giant for fraud," the jury found each element of

fraud.  (Doc. 182 at 1)

The motion for judgment as a matter of law acquiesces in the jury's finding on

three of the four elements.  The jury found that, by representing that Giant would

continue supplying Flying Fish and that Giant would not supply a nearby

competitor, Giant misrepresented material facts.  The jury found that, by partnering

with Outspokin while simultaneously negotiating with Flying Fish, Giant knew the

falsity of the representations.  The jury found that, by keeping news of the

Giant–Outspokin store from Flying Fish, by offering reduced prices for 2013, and by

emphasizing renewed and lasting relations, Giant intended to induce Flying Fish to

rely on the misrepresentations.  The motion for judgment as a matter of law disputes,

of the four elements, only that Flying Fish "relied on [the misrepresentations] to [its]

detriment." *Jackson*, 108 So. 3d at 595 n.2.

**(1)  Flying Fish relied on the misrepresentation.**

Arguing that Flying Fish "did not rely on" the misrepresentations, Giant states "that the placement and size of Flying Fish's 2013 preseason order was predicated exclusively on Flying Fish's internal assessment of its own needs, the financial incentives offered by [Giant], and Flying Fish's adherence to its proprietary 'Product Matrix.'" (Doc. 202 at 7; *see* Doc. 212 at 112)  However, by stating that Flying Fish's purchase "was predicated . . . on the financial incentives," Giant admits that Flying Fish relied on Giant's material misrepresentations.  Godsey offered an extraordinary incentive (unknown to any other Giant dealer) — *i.e.*, offered reduced prices without requiring Flying Fish to place a large order up-front for 2013 — ostensibly as a gesture of "re-started," friendly, and lasting business relations.  (Pl.'s Ex. 54 at 2; Pl.'s Ex. 62 at 1)  However, Godsey knew that, if Flying Fish learned of Giant's plan to open a concept store in Flying Fish's primary market, Flying Fish would either decline entirely to purchase Giant bicycles or markedly reduce the size of the purchase.  Godsey offered the incentives to Flying Fish to cement Flying Fish's commitment to Giant and simultaneously permit Giant to axe Flying Fish at will, which Giant already schemed to accomplish.

Further, Flying Fish's purchase "was predicated" on more than "Flying Fish's internal assessment of its own needs."  First, during negotiations and before agreeing to purchase Giant bicycles, Kane asked Godsey for "a clarification on what [Giant's] plans may actually be." (Pl.'s Ex. 54 at 2)  Second, Taylor Norton, the buyer for

Flying Fish, testified that he "would not release an order of that size without [Kane's] okay" and that Kane "was waiting to hear from a number of people from Giant." (Doc. 212 at 231; Doc. 221 at 6)  Finally, Kane testified that "he wouldn't have placed any order with Giant had he known what Giant was planning and the untruthfulness of the representations."  (Doc. 202 at 7; Doc. 212 at 101–102; Doc. 221 at 6)  Flying Fish presented several "legally sufficient evidentiary bas[e]s for a reasonable jury to find" that Flying Fish's purchase "was predicated on" more than "Flying Fish's internal assessment of its own needs" and that Flying Fish relied "to its detriment" on Giant's misrepresentations about Giant's present plan for business with Flying Fish.  *Collins*, 749 F.3d at 957.

### (2)  The falsity of Giant's misrepresentation was not "obvious" to Flying Fish.

"[A] recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him."  *Butler*, 44 So. 3d at 105. Giant argues that, even if Flying Fish relied on the misrepresentations "to its detriment," the reliance "was improper as a matter of law" because the falsity of the representations would have been "obvious" to Flying Fish.  (Doc. 202 at 9) According to Giant, the falsity of the representation that Giant would continue dealing with Flying Fish would have been "obvious" because the Dealer Agreement states, "[E]ither party may terminate this Agreement, without cause, upon 90 days

written notice to the other party." (Doc. 202 at 11; Def.'s Ex. 2 at 5)  Also, according to Giant, the falsity of the representation that Giant would not sell to a nearby competitor would have been "obvious" because the Dealer Agreement states, "Giant agrees . . . to sell its Giant brand bicycles . . . only through 'Authorized' dealer locations." (Doc. 202 at 11; Def.'s Ex. 2 at 2)

Since 2006, when the parties signed the Dealer Agreement, Giant had neither terminated the agreement nor added an "authorized" dealer near Flying Fish.  No cause existed for Flying Fish to believe that Giant would attempt either in 2013. Above and beyond the dealer agreement, Giant actively withheld any information that would cause Flying Fish to believe that in 2013 Giant would terminate the agreement or would partner with Outspokin, an "authorized" dealer, to open a store near Flying Fish.  Giant asked Outspokin to not disclose the new store and employed an internal strategy of keeping the information from Flying Fish.  After Flying Fish asked Giant about a possible addition of an "authorized" dealer in South Tampa, Singer responded to Gorman, "I'm not aware of any distribution changes taking place in S[outh] Tampa." (Pl.'s Ex. 107 at 1–4)  The falsity of Giant's representations was not "obvious" to Flying Fish, who "presents . . . legally sufficient evidentiary bas[e]s for a reasonable jury to find for Flying Fish on" the claim for fraudulent misrepresentation. *Collins*, 749 F.3d at 957.

### B.   Flying Fish proved a loss of profits as a result of Giant's fraudulent misrepresentation.

In addition to disputing fraudulent misrepresentation, the renewed motion for judgment as a matter of law argues that Flying Fish "present[ed] no legally sufficient evidentiary basis for a reasonable jury to find for [Flying Fish] on a material element of" lost profits.  (Doc. 202 at 4)  "When a party seeks [lost profits] based upon a breach of contract or other wrong, the party must prove that the lost profits were a direct result of the defendant's actions and that the amount of the lost profits can be established with reasonable certainty."  *Whitby v. Infinity Radio Inc.*, 951 So. 2d 890, 898 (Fla. 4th DCA 2007) (Hazouri, J.).  Giant argues that — because "Flying Fish failed to prove causation as a matter of law" and because "Flying Fish also failed to prove the fact of its lost profit damages with reasonable certainty" — "no reasonable jury could conclude that Giant Bicycle caused 100% of Flying Fish's storewide lost profits in 2013 and 2014."  (Doc. 202 at 13, 14, 18)

To the extent Giant argues that the jury awarded Flying Fish the entirety of Flying Fish's lost profits in 2013 and 2014, Giant is incorrect.  Although Steven S. Oscher, Flying Fish's expert witness on lost profits, opined that Flying Fish suffered a total loss of $416,914, the jury awarded only $250,000 in compensatory damages.  To the extent Giant argues that Flying Fish must prove the entirety of the lost profits as the "direct result" of Giant's actions, Giant misstates the standard.  "[O]nce causation is proven with reasonable certainty, uncertainty as to the precise amount of

the lost profits will not defeat recovery so long as there is a reasonable yardstick by which to estimate the damages." *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1213 (11th Cir. 2006); *accord Whitby*, 951 So. 2d at 898 ("Difficulty in proving damages or uncertainty as to the amount will not prevent recovery as long as it is clear that substantial (rather than merely nominal) damages were suffered as a result of the wrong."). Thus, Flying Fish may recover lost profits "so long as" (1) Flying Fish proves with "reasonable certainty" that the "lost profits were a direct result of the defendant's actions" and (2) "there is a reasonable yardstick by which to estimate the" lost profits. *Nebula Glass*, 454 F.3d at 1213; *Whitby*, 951 So. 2d at 898.

> **(1)      Giant's fraudulent misrepresentation caused Flying Fish's lost profits.**

Arguing that Flying Fish failed to prove with "reasonable certainty" that "lost profits were a direct result of [Giant's] actions," Giant states that "the only evidence Flying Fish adduced on the issue of causation was [Kane]'s personal belief." (Doc. 202 at 14)  However, for the same sound and almost universally accepted reasons that a homeowner's testimony is admissible on the value of the owner's home, an entrepreneur's testimony is admissible on the value of the business the entrepreneur directs.  The finder-of-fact determines the weight of the entrepreneur's testimony, perhaps in the context of the testimony of an expert, but the entrepreneur's testimony is admissible nonetheless.

Kane's testimony proves that "lost profits were a direct result of [Giant's] actions." *Whitby*, 951 So. 2d at 898.  Describing the effect of the new Giant–Outspokin store nearby in "the Howard Ave. area," Kane stated:

> [Outspokin] came in discounting the product. I mean, our product was already devalued, so they came in discounting the product on top of that. They had huge support from Giant doing promotions and bringing their race team in and, you know, things that never ever occurred in all the years we had worked with Giant. And then on top of it, they made a point of anyone looking at a Giant product, to inform them that we were no longer a dealer and we could not warranty the product.

(Doc. 211 at 160)  Because after June 2013 Giant no longer reimbursed Flying Fish for warranty parts and labor on Giant bicycles that Flying Fish sold, Flying Fish had to repair Giant bicycles "out of our own pocket, because we don't want to lose customers or leave the wrong impression."  (Doc. 211 at 159)  Also, after Giant discontinued supplying Flying Fish and while Flying Fish searched for a substitute supplier, Flying Fish had to obtain "cash flow" by selling at discounted prices "[a]ll brands, all accessories, everything we did."  (Doc. 211 at 162)

Flying Fish offers more than Kane's testimony to prove causation.  A review of the parties' e-mails reveals that, if Flying Fish had known about the forthcoming Giant–Outspokin store and Giant's plans to terminate Flying Fish, Flying Fish would have either declined to purchase Giant bicycles or markedly reduced the size of the purchase for 2013.  And Flying Fish's profits suffered as a result of the purchase of each additional bicycle.  Further, Gormon explained at trial how both Giant's abrupt termination of Flying Fish and the nearby competition from

- 17 -

Outspokin adversely affected not only Flying Fish's sale of Giant bicycles but Flying

Fish's sales of all other bicycles:

> [W]e definitely saw a downturn in sales. Because you remember that the
> store opened up right next to us, we have the same bikes in that store
> and they were reducing the prices on the bikes. So what happens is it
> means that we had to reduce the prices on brand-new bikes and that
> actually devalues every sale that we do in the store, meaning if
> somebody comes in looking for a great price on a Giant, the assumption
> is that all the other bikes in the store are going to be at a great price too,
> so our margins took a hit on top of that.

(Doc. 212 at 168–169)  Flying Fish successfully proved that "lost profits were a direct

result of [Giant's] actions."  *Whitby*, 951 So. 2d at 898.

### (2)   Flying Fish proved the amount of lost profits with reasonable certainty.

In addition to disputing causation, Giant argues that Flying Fish "failed to

prove the fact of its lost profit damages with reasonable certainty."  (Doc. 202 at 13,

14, 18)  However, Oscher offered "a reasonable yardstick by which to estimate the

damages."  *Nebula Glass*, 454 F.3d at 1213.  After reviewing "tax returns" and

"audited financial statements" from 2009 to 2012, Oscher calculated the weighted

average of Flying Fish's growth in sales:

> I did the analysis here and the time period 2008 to 2009 grew by
> 13.4 percent, from '09 to '10 it grew by 3.5, 10.3, and 2.2 percent
> respectfully. . . . I did not use the 13.4 percent increase, because from
> 2008 is when [Flying Fish] opened up another store to 2009, and I didn't
> think that increase year-over-year sales was an appropriate measure for
> what I was doing. So I eliminated that and only used this three-year
> period [from 2009 to 2012]. . . . Obviously, the year most recent would
> probably be a reflection — assuming everything stays the same [—] a
> good reflection of how the company is operating. But to look at just one
> year would not be very good, that's why you average. But conceptually
> and mathematically, if we can go back and weight the most recent [year]

higher, the year prior a little bit less and a little bit less . . . So in this case, 50 percent of the weight would go to the [2.2 for 2012], 33.3 percent would go to [10.3 for 2011], and then we would have one-sixth, which would go to [3.5 for 2008,] the furthest year.

(Doc. 215 at 37, 38, 40)  Concluding that the weighted average of Flying Fish's growth in sales from 2009 to 2012 was 5.1%, Oscher calculated, from the 2012 sales ($2,241,049), the expected sales in 2013 ($2,355,342) and the expected sales in 2014 ($2,475,465).  Because the actual sales in 2013 were $2,061,383 and because the actual sales in 2014 were $1,826,180, the difference between expected sales and actual sales in 2013 was $293,959 and in 2014 was $649,285, for a total of $708,041. (Doc. 215 at 53, 54; Pl.'s Ex. 171 at 1)

Using the same method of calculating a weighted average of growth in sales, Oscher calculated the weighted average of Flying Fish's gross profit from 2009 to 2012 — 47.2%.  Oscher decided to deduct from the 47.2% the 3% attributable to "additional expenses that would be variable, that would be incremental to sales, for example, merchant fees [and] credit card fees."  (Doc. 215 at 54)  Oscher then calculated the lost profit for each year as the product of 44.2% (which is 47.2% minus 3%) and the difference between expected sales and actual sales.  (Doc. 215 at 54; Pl.'s Ex. 171 at 1)  Thus, Oscher's estimated lost profit for 2013 was $129,930, which was 44.2% of $293,959, and his estimated lost profit for 2014 was $286,984, which was 44.2% of $649,285.  Oscher's sum of the estimated lost profit for the two years was $416,914, which was 44.2% of $708,041.

Oscher conceded that he reviewed financial information for "Flying Fish's total business operations, both the MacDill and west store locations," and that he "didn't look at any of the individual brands for profitability." (Doc. 215 at 65, 67)  During the legal argument at trial about Oscher's testimony, Giant summarized several other factors that conceivably caused the lost profits:

> But since then we have learned there are a number of factors that may have played a role that Mr. Kane apparently dismissed out of hand, including the Specialized termination in July of 2012, the Cervelo brand replacing Specialized and the impact of Cervelo sales on profits and losses, the Specialized opening of another store within two miles of Flying Fish in 2012, the opening of other competitors within five miles of Flying Fish in 2012 and 2013, and the Raleigh brand . . . replacing Giant in 2013 and its impact.[4]

(Doc. 215 at 13)  Giant introduced these factors to the jury during the cross-examination of Oscher.  Although Oscher concluded that in 2013 and 2014 Flying Fish suffered a loss of $416,914, the jury — with the benefit of evidence of the other factors that might have contributed to a decline in profit — awarded $250,000.

Although "the sum the jury awarded (*i.e.*, $250,000) does not [equal] the lost profit damage figures presented at trial" (Doc. 202 at 18, 19), Flying Fish successfully offered to the jury "a reasonable yardstick by which to estimate the damages." *Nebula Glass*, 454 F.3d at 1213.  Flying Fish "presents . . . legally sufficient

---

[4] However, as Oscher testified, Flying Fish had the highest sales and the highest operating income in 2012, (1) when Flying Fish replaced Specialized with Cervelo, (2) when Specialized opened a store within two miles of Flying Fish, and (3) when other competitors opened a store within five miles of Flying Fish. Further, Flying Fish was prompted to contract with Raleigh in 2013 because Giant terminated Flying Fish.

- 20 -

evidentiary bas[e]s for a reasonable jury to find for Flying Fish on" lost profits. *Collins*, 749 F.3d at 957.

### C. Flying Fish proved that Giant's fraudulent misrepresentation entitles Flying Fish to punitive damages.

Giant argues in the motion for judgment as a matter of law that "because Flying Fish failed to establish three of the five elements necessary to prevail on its fraudulent misrepresentation claim, [Giant] also is entitled to judgment as a matter of law on the issue of punitive damages." (Doc. 202 at 19)  Because the jury correctly found fraudulent mispresentation and awarded compensatory damages, an award of punitive damages was an option available to the jury.  *See Cruise v. Graham*, 622 So. 2d 37, 41 (Fla. 4th DCA 1993) (Hersey, J.) ("[T]he rule now seems clear in Florida that a claim of fraud sufficient to justify compensatory damages is also sufficient to support an award of punitive damages.").

Both the motion for judgment as a matter of law and the motion for a new trial or for a remittitur argue that the amount of punitive damages is excessive.  The correct remedy for excessive punitive damages is a new trial or a remittitur, not a judgment as a matter of law.  Section II of this order, which resolves Giant's motion for a new trial or for a remittitur, will first address other issues raised in the motion and then determine that the amount of punitive damages is not excessive.

## II. Giant's Motion for a New Trial or for a Remittitur

Under Rule 59, Federal Rules of Civil Procedure, "[t]he court may, on motion, grant a new trial on all or some of the issues." A new trial is required "when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quotation marks omitted). "[A] remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage[s] award exceeds the amount established by the evidence." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1266 (11th Cir. 2008). Moving for a new trial or for a remittitur, Giant argues (1) that "Flying Fish did not establish that its lost profits were a direct result of Giant Bicycle's alleged misconduct or that the amount of those damages were determinable with reasonable certainty," (2) that "the court erred in excluding evidence that substantially undermines [Kane's] credibility and plaintiff's lost profit claims," and (3) that "the jury's $3 million punitive damage[s] award is arbitrary, excessive and does not comport with Florida or federal law." (Doc. 201 at 4, 13, 19)

### A.  Giant repeats the argument that Flying Fish failed to prove lost profits.

In arguing that "Flying Fish did not establish that its lost profits were a direct result of Giant Bicycle's alleged misconduct or that the amount of those damages were determinable with reasonable certainty," Giant repeats the arguments rejected earlier in this order in resolving Giant's motion for judgment as a matter of law.

(Doc. 201 at 13)  As explained above, the jury's award of $250,000 in compensatory damages is neither "against the clear weight of the evidence" nor "a miscarriage of justice." *Lipphardt*, 267 F.3d at 1186.

### B.   Evidence of Kane's signing a claim form for a class action was correctly excluded at trial.

The motion for a new trial argues that during both Giant's direct examination of Kane and Giant's cross-examination of Oscher (Doc. 201 at 23; Doc. 215 at 78) "the court erred in excluding" a complaint that Giant says was "filed by [Kane] and Flying Fish, among other plaintiffs, in [a] BP class action lawsuit" (the BP complaint).

### (1)   The evidence was trivial, distracting, and wasteful.

During Giant's direct examination of Kane on the sixth day of trial, Giant attempted to impeach Kane by asking him why he testified on the second day of trial that he had "[n]ever been involved, either as a defendant or a plaintiff, in any lawsuit." (Doc. 215 at 124)  Kane clarified that he "made a mistake" in answering earlier that he had never "been involved as a . . . plaintiff in any lawsuit." (Doc. 215 at 124)  Kane explained that he "had signed a claim form years prior and had forgotten it; that he was not aware he had been included in any lawsuit and had never seen a copy; that he was not one of the named parties but was one of 4,000 plaintiffs; and that he never received any benefit from it." (Doc. 222 at 20)  This matter of the claim form and the BP complaint was trivial, distracting, and wasteful

of courtroom time and attention, a topic sinking distinctly below the standard required for evidence under Rule 403 (and at no time during Kane's testimony did Giant offer the BP complaint into evidence).

### (2)    The evidence was irrelevant to Oscher's testimony.

On the same day, the sixth day of trial, before Giant's direct examination of Kane and during the cross-examination of Oscher, Giant attempted to introduce into evidence the BP complaint. Flying Fish objected because Flying Fish had "never been advised of" the BP complaint and because the BP complaint had never appeared on an exhibit list. (Doc. 215 at 78) The objection was sustained and the jury was instructed to disregard any mention of the BP complaint. Giant disputes both the sustaining of the objection and the jury instruction.

Flying Fish's objection was correctly sustained for several reasons. First, Giant failed entirely to respond to the objection that Giant never disclosed the BP complaint either during pre-trial disclosure or in the required list of exhibits for trial. Second, instead of responding to the objection, Giant argued the BP complaint's relevance in impeaching Kane. Thus, Giant "attempt[ed] through [Oscher], the economic expert, to impeach [Kane]." (Doc. 215 at 79) Third, Giant argued that the BP lawsuit is relevant to Oscher's testimony because the BP lawsuit explains a cause of Flying Fish's lost profits. However, the resolution (Doc. 215 at 5–16) of a *Daubert* motion (Doc. 165) earlier that day clarified that Oscher would testify about only the amount of loss, not the cause of loss. *See Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 591 (1993).  Because Giant failed to respond to the main point of Flying Fish's objection, because Giant attempted to impeach Kane by Oscher's testimony, because Giant failed to explain the BP lawsuit's relevance to Oscher's testimony, and because Giant failed to establish the prospective inquiry's probative value (or otherwise to meet the demand of Rule 403, Federal Rules of Evidence), Flying Fish's objection was sustained.

During the cross-examination of Oscher and after failing to introduce the BP complaint into evidence, Giant nevertheless attempted to question Oscher about the BP lawsuit.  Giant asked, "Mr. Oscher, in your discussions with Mr. Kane, did he ever tell you that he filed a lawsuit against BP in April of 2013, the same time that the very first invoice came due?"  (Doc. 215 at 81)  Because Oscher had already testified that "he did not discuss" the BP lawsuit with Kane, an objection was sustained.  (Doc. 215 at 81)  Giant changed the "line of question[ing]" and never returned to the discussion of the BP lawsuit.  (Doc. 215 at 81)  After Giant's cross-examination of Oscher, Flying Fish (1) moved to strike the question about the BP lawsuit from the record and (2) requested an instruction that the jury disregard the question.  In accord with the request, the court struck the question and instructed the jury:

> During the latter part of Mr. Oscher's testimony he was asked questions by [counsel] for the defense. At one point you heard a question begin, there was an interruption in the question by an objection, and counsel came to sidebar and we had a brief discussion, after which counsel went to another topic.

What I think you heard from [counsel] in formulating his question was a reference to the so-called BP litigation, unquote, and some action that might have been initiated with respect to that by the parties to this case. I have ruled that that matter is irrelevant and I strike the part of the question that you heard the same way that I excluded the exhibit.

So you should disregard that reference to the BP litigation and not base any part of your deliberation or any part of your conclusion on anything you might think you know about the contents of that case.

I want to make it clear that no one is being scolded here for asking a question. It's just a legal determination that I have made that the two matters are distinct and that case — that BP case — has no role in your deliberations here.

(Doc. 215 at 104)  The instruction correctly informs the jury that the BP lawsuit is irrelevant to Oscher's testimony and instructs to jury to disregard any mention of the BP lawsuit.  Giant interposed no timely objection to the instruction.  The motion for a new trial fails to identify any error in the instruction.

**C.   The punitive damages are not excessive.**

Because Flying Fish claims a violation of Florida law, the jury instructions and verdict form on punitive damages mirror the language of Section 768.73(1), Florida Statutes, which governs the amount of punitive damages:

(1)(a) Except as provided in paragraphs (b) and (c), an award of punitive damages may not exceed the greater of:

1. Three times the amount of compensatory damages awarded to each claimant entitled thereto, consistent with the remaining provisions of this section; or

2. The sum of $500,000.

(b) Where the fact finder determines that the wrongful conduct proven under this section was motivated solely by unreasonable financial gain and determines that the unreasonably dangerous nature of the conduct,

together with the high likelihood of injury resulting from the conduct, was actually known by the managing agent, director, officer, or other person responsible for making policy decisions on behalf of the defendant, it may award an amount of punitive damages not to exceed the greater of:

　　1. Four times the amount of compensatory damages awarded to each claimant entitled thereto, consistent with the remaining provisions of this section; or

　　2. The sum of $2 million.

(c) Where the fact finder determines that at the time of injury the defendant had a specific intent to harm the claimant and determines that the defendant's conduct did in fact harm the claimant, there shall be no cap on punitive damages.

Subsection (a) limits punitive damages to the greater of three times the compensatory damages and $500,000. Subsection (b) increases the limit to the greater of four times the compensatory damages and $2 million. Subsection (c) removes the limit altogether.

　　Following the ascending structure of Section 768.73(1), the verdict form asks the jury, if "you have elected to assess punitive damages against Giant":

　　a. Did a person responsible for making policy decisions at Giant condone, authorize, or assist in the misrepresentations to Flying Fish?

　　b. Did Giant actively and knowingly participate in the misrepresentations?

　　c. Were the misrepresentations by Giant motivated solely by unreasonable financial gain?

　　d. Was the unreasonably dangerous nature of Giant's conduct, together with the high likelihood of injury resulting from the conduct, actually known by a manager, director, or officer of Giant?

　　e. When the misrepresentations were made to Flying Fish, did a manager, officer, or director of Giant have a specific intent to harm

- 27 -

Flying Fish and did the conduct of Giant's manager, director, or officer in fact harm Flying Fish?

(Doc. 182 at 2–3)  By answering affirmatively each question, the jury in effect applied Section 768.73(1)(c) and removed the limit on punitive damages.  The jury awarded $3 million in punitive damages, twelve times the $250,000 in compensatory damages.

### (1)    The punitive damages are not excessive under Florida law.

The motion for a new trial or for a remittitur argues that "the jury's $3 million punitive damage[s] award . . . does not comport with Florida or federal law." (Doc. 201 at 4)  Under Florida law, "the manifest weight of the evidence [must] not render the amount of punitive damages assessed out of all reasonable proportion to the malice, outrage, or wantonness of the tortious conduct."[5]  *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246, 1263 (Fla. 2006).  Section 768.74, Florida Statutes, lists considerations "[i]n determining whether an award is excessive or inadequate":

> (a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;
>
> (b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;
>
> (c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;

---

[5] "Additionally, an award must be reviewed to ensure that it bears some relationship to the defendant's ability to pay and does not result in economic castigation or bankruptcy of the defendant." *Engle v. Liggett Grp., Inc.*, 945 So. 2d 1246, 1263 (Fla. 2006). Neither the motion for a new trial nor the motion for a remittitur questions Giant's ability to pay, which is unquestioned in the evidence also.

(d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and

(e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

Arguing that the amount of punitive damages is not "supported by the evidence" (Section 768.74(e)), Giant repeats arguments rejected in resolving Giant's motion for judgment as a matter of law.  The arguments are again rejected.  Arguing that the jury "either ignored or misperceived the largely uncontroverted evidence" (Section 768.74(b)), Giant claims that in awarding the punitive damages the jury failed to consider Giant's extending "generous pricing and payment incentives" to Flying Fish.  (Doc. 201 at 7)  However, Giant's claim of beneficence is akin to a homeowner's claim that placing cheese in a mousetrap is a "generous food incentive" for a mouse.  The evidence, the jury, and this order establish that Giant tactically and deceptively offered the incentives only to induce Flying Fish to buy from Giant — to rely to Flying Fish's detriment on Giant's misrepresentations.  Giant's argument is rejected.

Giant argues that the ratio of punitive damages to compensatory damages is the result of prejudice (Section 768.74(a)) and speculation (Section 768.74(c)).  Also, Giant argues that "the award does not bear any (let alone a reasonable) relation to the amount of damages allegedly suffered by Flying Fish" (Section 768.74(c)).  (Doc. 201 at 6)  In support of these arguments, Giant states that, "under Florida law, any punitive damage[s] award in excess of three (3) times the compensatory damages

is presumed to be excessive." (Doc. 201 at 6–7)  *See Brown v. R.J. Reynolds Tobacco Co.*, 113 F. Supp. 3d 1233 (M.D. Fla. 2015) (Savage, J.); *Lorillard Tobacco Co. v. Alexander*, 123 So. 3d 67, 81 (Fla. 3d DCA 2013) (Rothenberg, J.).  The $3 million award of punitive damages is twelve times the $250,000 award of compensatory damages.[6]

The "3-to-1-ratio" presumption in Giant's motion, in *Brown*, and in *Alexander* derives from Section 768.73(1)(a), which limits punitive damages to the greater of three times the compensatory damages and $500,000.  However, by operation of the statutory provision that states "[e]xcept as provided in paragraphs (b) and (c)," Section 768.73(1)(a) explicitly excludes Sections 768.73(1)(b) and (1)(c) from the "3-to-1-ratio" presumption.  Section 768.73(1)(c), which removes the limit on punitive damages, applies "[w]here the fact finder determines that at the time of injury the defendant had a specific intent to harm the claimant."  The evidence supports the jury's finding that Giant "had a specific intent to harm" Flying Fish. (Doc. 182 at 3)  (*See* Doc. 213 at 153 ("[Although Frederick] advised both [Singer] and [Godsey] that [Frederick] didn't feel it was the right thing to do, . . . [Singer]'s response was, I have three kids to feed, I need the order, and [Godsey]'s response

---

[6] The motion for a new trial or for a remittitur attempts to compare the punitive damages to the "net compensatory award" — *i.e.*, $250,000 minus the amount Flying Fish owed Giant for purchases in 2013. (Doc. 201 at 6) However, Flying Fish agreed (Doc. 215 at 112) during trial to pay the owed money to Giant, and neither the jury instructions nor the verdict form mentioned the money. Further, Giant abandoned this attempt to compare the punitive damages to the "net compensatory award" during a January 22, 2016 hearing on the motion for judgment as a matter of law and on the motion for a new trial or for a remittitur.

was, I need — I'm here to sell bikes and we need to hit numbers in [the fourth quarter], so we need to do what we can to sell bikes."); Pl.'s Ex. 93 at 1 ("At this point [Kane] has ZERO idea about what is about to take place.  I played things very cool, remained calm and [Kane] is all BARK and no BITE as I suspected."))  Thus, under Section 768.73(1)(c), the jury removed the limit on punitive damages and awarded an amount that is twelve times the compensatory damages.  The five considerations in Section 768.74 certify that the amount of punitive damages is neither excessive nor inadequate.

*Owens-Corning Fiberglas Corp. v. Ballard*, 749 So. 2d 483, 487 (Fla. 1999), explains that:

> Under Florida law . . . [p]unitive damages are peculiarly left to the discretion of the jury as the degree of punishment to be inflicted must always be dependent on the circumstances of each case, as well as upon the demonstrated degree of malice, wantonness, oppression, or outrage found by the jury from the evidence.

"Under Florida law, the purpose of punitive damages is not to further compensate the plaintiff, but to punish the defendant for its wrongful conduct and to deter similar misconduct by it and other actors in the future." *Owens-Corning*, 749 So. 2d at 487. Accordingly, the jury was instructed, "If you find for Flying Fish and against Giant on the fraud claim, you must decide whether in addition to the lost profit punitive damages are warranted as punishment to Giant and as a deterrent to others." (Doc. 216 at 19)  Based on "the circumstances of [this] case," the jury found that $3 million in punitive damages is necessary to punish Giant and to deter similar

conduct by Giant and others tempted by an economic gain from similar duplicity. *Owens-Corning*, 749 So. 2d at 487. The jury's award of $3 million in punitive damages comports with Florida law.

(2)    **The punitive damages are not excessive under federal law.**

The motion for a new trial or for a remittitur argues that "the jury's $3 million punitive damage[s] award . . . does not comport with" the due process clause of the Fourteenth Amendment. (Doc. 201 at 4) "While 'punitive damages may properly be imposed to further a [s]tate's legitimate interests in punishing unlawful conduct and deterring its repetition,' and states 'have considerable flexibility in determining the level of punitive damages that they will allow,' an award runs afoul of the due process clause when it 'can fairly be categorized as grossly excessive in relation to these interests.'" *Myers v. Cent. Florida Investments, Inc.*, 592 F.3d 1201, 1218 (11th Cir. 2010) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 560 (1996)). In determining whether an award is grossly excessive, a court must consider "three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *Gore*, 517 U.S. at 575).

(a) *Reprehensibility*

The first guidepost, the degree of reprehensibility, is the "dominant consideration in the evaluation" of whether an award is grossly excessive. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1283 (11th Cir. 2008); *accord State Farm*, 538 U.S. at 409; *Gore*, 517 U.S. at 575. To determine this degree, "a court must consider whether":

> [1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 409, 419; *accord Goldsmith*, 513 F.3d at 1283. The first and second elements favor finding a low degree of reprehensibility. Flying Fish suffered purely economic harm, and Giant's fraudulent misrepresentations involved no threat to the "health or safety of others."

The third element, "financial vulnerability," favors finding a high degree of reprehensibility. Arguing that Flying Fish "was a profitable business" and that Flying Fish "was voted Best in the Bay" (Doc. 201 at 11, 12), Giant attempts to define "financial vulnerability" as an objective standard that a plaintiff either meets or — as in this case — fails to meet. However, a determination of financial vulnerability cannot occur in isolation from a plaintiff's relation to a particular defendant. For example, *Myers*, 592 F.3d at 1219–20, affirms a district court's finding of financial vulnerability because, "although this battery claim did not

- 33 -

involve financial consequences for Plaintiff *per se*, the events did occur in the workplace and Plaintiff's boss — who controlled Plaintiff's earnings — was the one who committed the acts." *Accord Goldsmith*, 513 F.3d at 1283; *U.S. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 614 (11th Cir. 2000); *see also Sepulveda v. Burnside*, 432 Fed. Appx. 860, 865 (11th Cir. 2011) (per curiam) ("[A]lthough [the plaintiff] was not financially vulnerable, he was vulnerable [because] he relied on [the correctional center's] policies to protect him from other inmates."). Financial vulnerability depends on how susceptible the plaintiff is to the particular tactic deployed by, and the particular wrong effected by, the defendant. For example, *State Farm*, 538 U.S. at 433, affirms a district court's finding financial vulnerability to the tortious acts in that case because the plaintiffs were "least knowledgeable about their rights and thus most vulnerable to trickery or deceit."

Because of the state of Flying Fish and Giant's singular business relation, Flying Fish was financially vulnerable — singularly susceptible — to Giant's fraudulent misrepresentations. Giant took calculated steps to increase that vulnerability. First, Flying Fish's business largely depended on Giant bicycles, which Flying Fish had sold since 2006. Before the end of 2012, of the seven brands of bicycles that Flying Fish sold, Giant accounted for the highest sales and the highest profit margin. At a given time, a quarter of Flying Fish's inventory was Giant bicycles. Because Flying Fish was the only dealer of Giant bicycles in "the Howard Ave. area," customers associated Flying Fish with Giant bicycles. Second, in 2012

Giant increased Flying Fish's reliance on Giant's products by "g[etting] [Flying Fish]

to grow business with us" before abruptly terminating Flying Fish.  (Pl.'s Ex. 132

at 2)  At the time of termination, Flying Fish had sold only 17% of the Giant bicycles

that Flying Fish had bought for 2013.  Finally, through years of business, Kane had

developed a close personal relation with Jim Marshall, the sales representative who

preceded Singer, and with an executive of Giant Manufacturing Co. Ltd., the

Taiwanese manufacturer of Giant bicycles.  Even after a fight between Kane and

Singer, Giant reassured Kane of renewed and lasting relations between the parties.

Flying Fish was financially vulnerable — financially susceptible — to the tactics

designed by Giant to increase Flying Fish's reliance on Giant's products before axing

Flying Fish without warning.

During a January 22, 2016 hearing on the motion for judgment as a matter of

law and on the motion for a new trial or for a remittitur, Giant argued that Flying

Fish was not financially vulnerable because Flying Fish "did not go out of business"

after Giant's fraudulent misrepresentations.  But Giant confuses vulnerability with

submission.  Flying Fish remains in business because Giant refused to submit to the

financial repercussions of Giant's fraudulent misrepresentations and because of the

business acumen and dedicated diligence of Kane and his employees, not because

Flying Fish was not financially vulnerable to — and financially injured by — Giant's

fraudulent misrepresentations.  After Giant abruptly terminated Flying Fish and

while Flying Fish scrambled to find a substitute supplier, Flying Fish managed to

remain in business by selling at discounted prices "[a]ll brands, all accessories, everything we did" to obtain "cash flow" and by successfully contracting with Raleigh, a substitute supplier. (Doc. 211 at 162) The third element, "financial vulnerability," favors a high degree of reprehensibility.

The fourth element — whether "the conduct involved repeated actions or was an isolated incident" — also favors finding a high degree of reprehensibility. *State Farm*, 538 U.S. at 419. This element contrasts "conduct" that comprises "repeated actions" with "conduct" that is an "isolated incident." Giant attempts to argue that the repetition of only similar acts can constitute "repeated actions." However, *State Farm*, 538 U.S. at 423, explicitly states, "evidence of other acts need not be identical to have relevance in the calculation of punitive damages." *Accord Myers*, 592 F.3d at 1220. Specifically, the Eleventh Circuit has held that a defendant engages in "repeated actions" by committing several acts or omissions that are not similar but has the same consequence. For example, *Bogle v. McClure*, 332 F.3d 1347, 1361 (11th Cir. 2003), finds that because a board of trustees pursued a potentially discriminatory policy in the face of various warnings by management and because the policy resulted in discrimination, the board's "conduct" comprised "repeated actions." *See also Myers*, 592 F.3d at 1220. Also, the Eleventh Circuit has held that a defendant engages in "repeated actions" by committing several acts or omissions that are not similar but are in pursuit of the same goal. For example, *Eastern Property Development LLC v. Gill*, 558 Fed. Appx. 882, 888 (11th Cir. 2014) (Bucklew, J.), finds

"repeated actions" because the defendant intending to commit civil theft "entered the plaintiffs' business premises, changed the locks, obtained Alabama business licenses in the plaintiffs' names to open up a new bank account, deposited rent checks from the plaintiffs' tenants into that new account, fired the plaintiffs' employees, and sent letters redirecting rent payments away from the plaintiffs." *See also Parsons & Whittemore Enterprises Corp. v. Cello Energy, LLC*, 2010 WL 3803189, at *4 (S.D. Ala. Sept. 22, 2010) (Granade, J.).

Like the defendant in *Gill*, 558 Fed. Appx. at 888, Giant devised a scheme in pursuit of a single goal — maintaining Giant's "momentum" in the market by defrauding Flying Fish.  The scheme consisted of two seemingly inconsistent courses of action.  Pursuing the first course of action, Giant coordinated with Outspokin to acquire a prime retail property in "the Howard Ave. area," to re-design the interior of the store, and to stock the glamorous store with Giant bicycles.  Pursuing the second course of action, Giant both promised a lasting relationship with Flying Fish, who also operated in "the Howard Ave. area," and offered extraordinary incentives to induce Flying Fish to buy more bicycles than ever before.  Also, Giant fastidiously kept information about the new store from Flying Fish.  Each course of action required months of careful attention and implementation.  Through these concurrent courses of actions, by selling more bicycles to Flying Fish until Giant could sell bicycles to Outspokin, Giant attained the goal of maintaining Giant's "momentum"

in the market by defrauding Flying Fish.  Giant's conduct undeniably comprised "repeated actions."

Arguing that Giant's fraudulent conduct happened over only a few months, Giant attempts to introduce into the fourth element a requirement that the repeated actions occur over several years.  No such requirement exists.  The fourth element — whether "the conduct involved repeated actions or was an isolated incident" — favors finding a high degree of reprehensibility.

The fifth element — whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident" — also favors finding a high degree of reprehensibility.  *State Farm*, 538 U.S. at 419.  Previous sections of this order established that Flying Fish's harm "was the result of" Giant's purposeful deceit. Three of the five elements favor finding a high degree of reprehensibility.  "While there is no requirement that a certain number of the five [elements] be present in order to support a finding of reprehensibility, reprehensibility grows more likely as more factors are present." *Myers*, 592 F.3d at 1219.  The first guidepost, degree of reprehensibility, favors upholding the jury's award of punitive damages.  And "the evidence supporting the . . . finding of [the high degree of] reprehensibility alone justifies the punitive damages award." *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1322 (11th Cir. 2007).

(b) *Ratio*

The second guidepost — "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award" — also favors upholding the jury's award of punitive damages.  *State Farm*, 538 U.S. at 418.  "[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."  *State Farm*, 538 U.S. at 426; *accord Gore*, 517 U.S. at 580 ("[E]xemplary damages must bear a 'reasonable relationship' to compensatory damages.").  *State Farm*, 538 U.S. at 425, observes that a "single-digit ratio between punitive and compensatory damages" is "more likely to comport with due process."  During the January 22, 2016 hearing, Giant cited *State Farm* and argued for the stubborn and doctrinaire application of a "single-digit ratio."

*State Farm*, 538 U.S. at 425, describes the ratio of punitive damages to compensatory damages as "instructive" but declines "to impose a bright-line ratio which a punitive damages award cannot exceed."  *Accord Gore*, 517 U.S. at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula."); *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 676 (7th Cir. 2003) (Posner, J.) ("The Supreme Court did not . . . lay down a . . . single-digit-ratio rule.").  *Gore*, 517 U.S. at 582–83, recognizes that "[w]e need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. . . .  In

most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis."

By arguing for the strict application of a "single-digit ratio," Giant draws a "constitutional line" between, say, $2,497,500 — 9.99 times the amount of compensatory damages — and $3 million — twelve times the amount of compensatory damages.  Giant argues that, while $2,497,500 is a "constitutionally acceptable" amount of punitive damages, $3 million is "constitutionally unacceptable."  *Gore*, 517 U.S. at 582, rejects this "categorical approach."  Both *State Farm*, 538 U.S. at 426, and *Gore*, 517 U.S. at 583, look beyond a "single-digit ratio" to determine whether the amount of punitive damages is "reasonable and proportionate to" the amount of compensatory damages or, in other words, whether the ratio is within the "constitutionally acceptable range."

Accordingly, the Eleventh Circuit has "upheld punitive damages awards that were greater than single-digit multipliers of compensatory damages when" "a particularly egregious act . . . resulted in only a small amount of economic damages." *Goldsmith*, 513 F.3d at 1284; *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1363 (11th Cir. 2004) (citing *State Farm*, 538 U.S. at 425).  In other words, punitive damages greater than single-digit multiples of compensatory damages are justified if the need to punish the defendant is ten or more times the need to compensate the plaintiff or — as *Goldsmith*, 513 F.3d at 1275, phrases it — if compensatory damages are "relatively small."

*Goldsmith*, 513 F.3d at 1275, determines that an amount of compensatory damages is "relatively small" because an applicable statute "capped" compensatory damages but the defendant's racial discrimination was "exceedingly reprehensible." *Kemp*, 393 F.3d at 1364, determines that an amount of compensatory damages is "relatively small" because, although an individual patron of AT&T expended only $115.05 playing a fraudulent phone game devised by AT&T, Georgia had a great "interest in deterring fraud and illegal gambling." Also, *Kemp*, 393 F.3d at 1364, determines that a single-digit multiple of $115.05 — "little more than a thousand dollars" — "levied against a company as large as AT&T, would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter." *See also W&O*, 213 F.3d at 615; *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1333 (11th Cir. 1999).

The need to punish Giant and to deter similar conduct by Giant exceeds ten times the financial harm that Flying Fish suffered. The first guidepost established a great need to punish Giant by showing that Giant's conduct was "exceedingly reprehensible." *Goldsmith*, 513 F.3d at 1275. Also, the need for deterrence is "substantial" because Giant contracts (presumably using an agreement similar to the Dealer Agreement with Flying Fish) with retail distributors across the United States and because Giant's senior executives (Thompson, the executive director of sales, and Walk, the general manager) actively participated in defrauding Flying Fish. *Goldsmith*, 513 F.3d at 1284. Finally, because Giant is a company with

approximately $128 million in annual sales and approximately $4 million in annual

operating income, an award of $3 million in punitive damages undoubtedly conveys

to Giant a memorable and unmistakable sting — as a punitive damage award is

designed to do — but a sting that is instructive and not destructive.  The 12-to-1 ratio

here is within the "constitutionally acceptable range."  *Kemp*, 393 F.3d at 1363; *Gore*,

517 U.S. at 583.  The second guidepost also favors upholding the jury's award of

punitive damages.

(c) *Comparable Cases*

The third guidepost, "which is accorded less weight in the reasonableness

analysis than the first two guideposts, involves a comparison between 'the punitive

damages award and the civil penalties authorized or imposed in comparable cases."

*Kemp*, 393 F.3d at 1364.  *Young v. Becker & Poliakoff, P.A.*, 88 So. 3d 1002, 1005

(Fla. 4th DCA 2012) (Taylor, J.), a comparable case, upholds an award of punitive

damages although the plaintiff suffered only economic harm ("legal malpractice and

breach of fiduciary duty") and despite a 14-to-1 ratio ($2 million to $144,000).

Similarly, *Kemp*, 393 F.3d at 1365, upholds an award of punitive damages although

the plaintiff suffered only economic harm (violation of the federal and state Racketeer

Influenced and Corrupt Organizations acts) and despite a 2,173-to-1 ratio ($250,000

to $115.05).  *Johansen*, 170 F.3d at 1320, upholds an award of punitive damages

although the plaintiffs suffered only economic harm (trespass and nuisance) and

- 42 -

despite a 93-to-1 ratio ($4.35 million and $47,000).  The third guidepost also favors

upholding the jury's award of punitive damages.

## CONCLUSION

Giant's motions (Docs. 224, 225) for leave to reply are **DENIED**.  Giant's

motion (Doc. 202) for judgment as a matter of law is **DENIED**.  Giant's motion

(Doc. 201) for a new trial or for a remittitur is **DENIED**.

ORDERED in Tampa, Florida, on February 22, 2016.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE